**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

CHARLES HANAFIN, Independent
Administrator of the Estate of Beth Ann
Hanafin, deceased,

        Plaintiff,

v.

GENERAL MOTORS, LLC,

        Defendant.

Case No. 22 C 1408

Honorable Sunil R. Harjani

## MEMORANDUM OPINION AND ORDER

On May 26, 2021, Beth Ann Hanafin was driving a pickup truck manufactured by Defendant General Motors when it allegedly malfunctioned, causing her to lose control of the vehicle and resulting in a crash. Mrs. Hanafin underwent medical care after the incident, including spinal surgery. Weeks later, Mrs. Hanafin passed away from a pulmonary embolism (a blockage of the lung artery from a blood clot) that Plaintiff asserts was related to the crash and the resulting medical care.

Plaintiff Charles Hanafin, as the independent administrator of the estate for his deceased wife, filed this lawsuit alleging strict liability and negligence against General Motors. Both parties have moved to exclude testimony from expert witnesses pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Plaintiff seeks the exclusion of Dr. Michelle Zeidler. Defendant moves for the exclusion of: (1) Dr. Mark Larkins; (2) David Pope; (3) Christopher Ferrone; and (4) Andrew Thomas. For the reasons and to the extent discussed below, the motions to exclude [111] [112] [113] [114] [115] are granted in part and denied in part.

**Discussion**

Federal Rule of Evidence 702 governs the admissibility of expert testimony in federal court. *Anderson v. Raymond Corp.*, 61 F.4th 505, 508 (7th Cir. 2023). Rule 702 provides that a witness "qualified as an expert by knowledge, skill, experience, training, or education may testify" if the expert's:

> (a) scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) testimony is based on sufficient facts or data;
>
> (c) testimony is the product of reliable principles and methods; and
>
> (d) opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. "In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court interpreted Rule 702 to require the district court to act as an evidentiary gatekeeper, ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand." *Gopalratnam v. Hewlett-Packard Co*., 877 F.3d 771, 778 (7th Cir. 2017) (cleaned up). To determine whether expert testimony is admissible, the district court performs a three-step analysis, evaluating: "(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony." *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 872 (7th Cir. 2021) (*citing Gopalratnam*, 877 F.3d at 779).

First, "[w]hether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990). "[A] court should consider a proposed expert's full range of practical experience as well as

2

academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

Second, reliability is "primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013). The Court's role is not to determine whether an expert's testimony is correct, but only whether it falls "outside the range where experts might reasonably differ." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999). If an expert's principles and methodologies are reliable, then the way to attack "shaky but admissible" evidence is through use of cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof – not exclusion. *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013).

Third, to establish relevance, the proponent must show that the expert's "reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 593. Said differently, the question is whether "the testimony will assist the trier of fact with its analysis of any of the issues involved in the case." *See Smith*, 215 F.3d at 718.

The proponent of expert testimony must establish its admissibility by a preponderance of the evidence. *See* Fed. R. Evid. 702; *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019). The Court employs the three-step analysis for each proposed expert and the related motions below.

**Plaintiff's *Daubert* Motion**

Beginning with Plaintiff's *Daubert* motion on Dr. Michelle Zeidler, Defendant retained Dr. Zeidler to opine on Mrs. Hanafin's medical care. Dr. Zeidler concluded that, while at St. Joseph's

Medical Center, Mrs. Hanafin was not properly diagnosed and evaluated with deep vein thrombosis, causing a deviation from the standard of care that contributed to her death.

Dr. Zeidler is a board-certified physician in internal, pulmonary, critical care, and sleep medicine. Since 2003, she has served as a Professor of Medicine at the University of California, Los Angeles, in the division of pulmonary and critical care medicine. She also serves as a sleep center and fellowship director at Greater Los Angeles Veterans Affairs. She has both instructed and practiced critical care, pulmonary care, and sleep medicine for decades. Plaintiff's motion seeks to exclude Dr. Zeidler's report based on objections to her qualifications, its relevance, and alleged speculation in her report.

Plaintiff initially asserts a qualification argument under the guise of challenging Dr. Zeidler's reliability. However, the evaluation of an expert's qualifications is separate from the reliability of the expert's methodology. *Kirk*, 991 F.3d at 872 (*citing Gopalratnam*, 877 F.3d at 779). Rule 702 contemplates admission of testimony by experts whose knowledge is based on extensive academic and practical expertise, or on observations from extensive and specialized experience. *Smith*, 215 F.3d at 718. "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (cleaned up).

As outlined above, Dr. Zeidler has decades of extensive training and practical experience in pulmonary, critical care, and sleep medicine. She previously worked as a critical care physician in an intensive care unit ([116-2] at 11:11–15) and continues to regularly work with outpatients who have disorders where deep vein thrombosis and pulmonary embolisms are involved. *Id.* at

4

11:20–12:22.  She therefore has the requisite qualifications to opine on Mrs. Hanafin's treatment regarding her deep vein thrombosis and pulmonary embolism, along with the standard of care.

The bulk of Plaintiff's brief is spent arguing that Dr. Zeidler's opinion is legally inconsequential and, therefore, should be excluded as irrelevant.  Plaintiff asserts that a malfunction in Defendant's vehicle caused Mrs. Hanafin to crash, resulting in the medical care (spinal surgery) that led to her death (pulmonary embolism from a blood clot).  The complaint alleges strict liability and negligence against Defendant for the incident.  To prove negligence in Illinois, a plaintiff must show: (1) a duty owed by the defendant to the plaintiff; (2) a breach; (3) an injury; and (4) that the breach proximately caused the injury. *See Scott v. Wendy's Props., LLC*, 131 F.4th 815, 819 (7th Cir. 2025).  Defendant contends that the pulmonary embolism that killed Mrs. Hanafin was not proximately caused by the incident.  Proximate cause consists of two sub-elements: cause in fact and legal cause. *See id.*

Cause in fact turns on whether the injury would have occurred absent the defendant's conduct. *Id.*  "This means either: (1) but for the defendant's conduct the injury would not have occurred or (2) the defendant's conduct was a material element and a substantial factor in causing the injury." *Id.* (cleaned up).  Only one test needs to be satisfied to prove cause in fact. *Id.*  Defendant's attempt to use Dr. Zeidler's report to elicit testimony that Mrs. Hanafin was facing a "real and imminent risk of a pulmonary embolism" before the car crash.  However, Dr. Zeidler's report does not draw this conclusion.  Dr. Zeidler reviewed the May 6, 2021, angiogram taken of Mrs. Hanafin's chest before the crash incident. [116-3] at 3.  The study showed no evidence of pulmonary artery embolus. *Id.*  Dr. Zeidler noted there was motion artifact in the angiogram, a common occurrence when a patient moves during the image acquisition.  From this study, Dr. Zeidler opines that the "amount of motion artifact exhibited in Mrs. Hanafin's May 6th CT

5

Angiogram prevents ruling out a small distal [pulmonary embolism] within a reasonable degree of medical certainty." *Id.* at 5, ¶ 6. While potentially relevant, Dr. Zeidler does not articulate a basis for this conclusion. She does not cite a study, or literature discussing how a motion artifact might obscure a pulmonary embolism or how frequently this occurs. Instead, she is purely speculating that, because there was a motion artifact, there *could* have been a small distal pulmonary embolism. As this conclusion is not founded in a reliable scientific methodology, it must be excluded. *See Porter v. Whitehall Lab'ys, Inc.*, 791 F. Supp. 1335, 1343 (S.D. Ind. 1992) *aff'd*, 9 F.3d 607 (7th Cir. 1993) ("An expert's mere guess or conjecture is properly excluded[.]").

In contrast to cause in fact, legal cause is a question of foreseeability. *See Scott*, 131 F.4th at 819. It answers the question of whether "the injury is of a type that a reasonable person would see as a likely result of his or her conduct." *Id.* (cleaned up). When there are multiple tortfeasors, the question becomes whether "the intervening efficient cause was a natural or probable result of the defendant's own negligence." *Id.* at 820 (cleaned up). "[U]nder Illinois law, an injury may have multiple proximate causes." *Hakim v. Safariland, LLC*, 79 F.4th 861, 872 (7th Cir. 2023). Here, the question is whether Mrs. Hanafin's pulmonary embolism was a "natural or probable result" of Defendant's alleged vehicle malfunction. To evaluate whether that is the case, a juror must understand what medical care Mrs. Hanafin was provided, whether it met the standard of care, and if it was foreseeable that a pulmonary embolism would have resulted in her death. To that end, Dr. Zeidler offered multiple opinions on whether St. Joseph Medical Center made medical errors by failing to diagnose and treat a pulmonary embolism that Mrs. Hanafin presented with on May 28, 2021, three weeks before her death. [116-3]. Dr. Zeidler concludes that the failure to diagnose and treat the already present pulmonary embolism was a deviation from the standard of care, which contributed to Mrs. Hanafin's death, and could have been avoided. *Id.* Dr. Zeidler's

standard of care conclusions are all relevant to the question of foreseeability and whether Mrs. Hanafin's injury was a probable or natural result of Defendant's negligence.

Third, Plaintiff argues that Dr. Zeidler's opinion fails because it is tainted by speculation and therefore unreliable. "[A] district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996). A court's reliability analysis focuses on an examination of the expert's methodology. *Smith*, 215 F.3d at 718. Here, Dr. Zeidler opines that St. Joseph Medical Center failed to diagnose Mrs. Hanafin's pulmonary embolism, contravening the standard of care and contributing to her death. The Seventh Circuit's decision in *Love v. United States*, 17 F.4th 753 (7th Cir. 2021) is determinative. In that case, the Seventh Circuit affirmed a district judge's decision to allow expert testimony on whether the standard of care was met. *Id.* at 754. There, the expert in question was a board-certified urologist, who testified about the appropriate course of treatment for a urinary tract infection. *Id.* The appellate court noted that medical doctors have a great amount of knowledge regarding their specialty and can testify to the medical standard of care. *Id.* at 756. Like *Love*, Dr. Zeidler is a board-certified physician in the specialty she is opining about – pulmonary and critical care. She has treated numerous pulmonary embolisms and is opining about the course of treatment for that medical condition. Her methodology is reliable.

Even so, Plaintiff asserts that Dr. Zeidler speculated about: (1) where the deep vein thrombosis began; and (2) the required course of treatment. However, Dr. Zeidler is not offering an opinion in her report about where in the body the deep vein thrombosis began, but rather that there was an intervening cause that resulted in death. [116-3]. When asked by Plaintiff in her deposition about whether there was evidence that Mrs. Hanafin had deep vein thrombosis in her

7

legs before her death, Dr. Zeidler noted that it was likely. [116-2] at 23:3–24:6, 51:6–15. This was based on her review of a radiologist's report in Mrs. Hanafin's medical records that exhibited a thrombus (blood clot) in Mrs. Hanafin's lungs three weeks before her death, but after the crash. *Id.* at 20:12–16. While this clot resolved itself, Dr. Zeidler opined that the clot that was the cause of death likely came from Mrs. Hanafin's legs, which were not scanned for clots when she was in the hospital recovering from the crash and resulting medical care. *Id.* at 20:12–16; 21:14–24:6; 51:6–15. In Dr. Zeidler's opinion, this failure to diagnose and treat the initial pulmonary embolism, including scanning Mrs. Hanafin's legs for additional clots, was a deviation from the standard of care that contributed to Mrs. Hanafin's death. [116-3] at 5, ¶¶ 1–4.

This brings the Court to the required course of treatment for pulmonary embolisms. As noted above, *Love* dictates that Dr. Zeidler can testify regarding this matter. 17 F.4th at 756. Still, Plaintiff contends that Dr. Zeidler speculated about what the proper standard of care is because, when asked in her deposition, Dr. Zeidler articulated the course of action she generally would have suggested, but stated other physicians may have acted differently. [116-2] at 47:16–49:22. She also testified that part of her course of action would be to discuss potential courses of treatment with the treating surgeon. *Id.* These minor statements from her deposition are inconsequential, will likely be part of any cross-examination, and do not change the overall admissibility of the testimony.

For the reasons stated above, Dr. Zeidler is qualified, and her testimony on the standard of care is reliable and relevant. However, her conclusion that a small distal pulmonary embolism from the May 6 CT angiogram ([116-3] at 5, ¶ 6) is not based on a reliable methodology and is excluded. Thus, Plaintiff's motion [115] is denied in part and granted in part.

**Defendant's *Daubert* Motions**

i.    **Dr. Mark Larkins (Medical Expert)**

Plaintiff hired Dr. Mark Larkins, a board-certified neurosurgeon who maintains a clinical practice, to testify about the causes of Mrs. Hanafin's injuries and death.  Dr. Larkins reviewed Mrs. Hanafin's records from St. Joseph Medical Center and Home Health Care, the Livingston County Coroner's Office, her death certificate, and the deposition of a pathologist, Dr. J. Scott Denton.  Dr. Larkins concluded, based on his "review of the materials and education, training and experience as a physician and neurosurgeon," that: (1) Mrs. Hanafin died of extensive deep venous thrombosis and subsequent pulmonary embolism; (2) spine surgery carries a risk of deep venous thrombosis and pulmonary embolism; (3) Mrs. Hanafin's injury carries a risk of pulmonary embolism as a result of venous thrombosis; and (4) the motor vehicle accident created the pathology requiring surgery which led to the pulmonary embolism.  Defendant does not object to Dr. Larkins' qualifications or the relevance of his testimony.  Instead, it challenges Dr. Larkins' opinion only on the second factor – that he fails to articulate a reliable methodology.

As noted above, the reliability inquiry is about the methodology employed, not the quality of underlying figures or the expert's determination. *Manpower*, 732 F.3d at 806.  An expert must show that the conclusions were based on a rigorous, objectively verified approach, *see Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 994 (7th Cir. 2019), and they cannot simply assert the bottom line. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010); *see also Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 776 (7th Cir. 2014) ("experience without reliable, testable methodology is not sufficient.").  In assessing reliability, courts consider flexible factors such as whether a theory: (1) can be or has been tested; (2) is subject to peer review; (3) is evaluated in light of potential error rates; (4) is accepted in the relevant scientific community;

9

and (5) has maintenance standards and controls. *Gopalratnam*, 877 F.3d at 779–80. Other considerations include whether the testimony was unjustifiably extrapolated from an accepted premise to an unfounded conclusion, if the expert accounted for obvious alternatives, and if maintenance standards and controls exist. *Id.*

Unlike Dr. Zeidler, Dr. Larkins is not testifying about the standard of care for spinal surgery, but the cause of the deep vein thrombosis. Frankly, he has failed to articulate any methodology for his conclusions, let alone a reliable one. Dr. Larkins' three-page report merely restates the various records he reviewed and declares his conclusions. [121-2]. He provides no information about the methodology he used to reach his conclusions. When pressed about his conclusions in his deposition, Dr. Larkins noted that he did not perform a tissue analysis, ([121-8] at 49:10–12), review any literature prior to preparing his opinions, (*id.* at 62:16–18), or perform any kind of differential diagnosis to compare the different possible causes of Mrs. Hanafin's deep vein thrombosis (*id.* at 69:15–20). For example, Dr. Larkins did not apply a specific methodology, such as a differential diagnosis or etiology, for weighing whether Mrs. Hanafin's obesity, heart disease, or COVID-19 caused the deep vein thrombosis. *Id.* at 64:7–68:23. He did not review any literature on the risk of deep vein thrombosis and pulmonary embolism after spinal surgery, but estimated there is significant risk based on his own experience. *Id.* at 54:1–15. Dr. Larkins simply opined his believed bottom-line conclusion – that since surgery can often cause deep vein thrombosis, it did in Mrs. Hanafin's case, and dwarfed other potential causes. *Id.* at 64:7–70:4. Without articulating any methodology for his diagnosis, the Court cannot allow Dr. Larkins to "waltz into the courtroom and render opinions[.]" *See Clark v. Takata Corp.*, 192 F.3d 750, 759 n. 5 (7th Cir. 1999).

Plaintiff attempts to rehabilitate Dr. Larkins by arguing that he did consider other causes of Mrs. Hanafin's deep vein thrombosis, and that the existence of those causes did not impact his analysis, because they have no legal consequence. As explained above, experts can testify to injury causation if they meet the standards of Rule 702 and *Daubert*. Here, the Seventh Circuit's analysis of the medical expert in *Robinson v. Davol Inc.* is instructive. 913 F.3d 690, 694–97 (7th Cir. 2019). In that case, an expert was needed to prove medical causation for a products liability claim. *Id.* at 695. The Seventh Circuit affirmed the district court's exclusion of the medical expert. *Id.* In so holding, the appellate court noted the district court properly found that the expert's theory was never tested, subjected to peer review, described in medical literature, or found in the decedent's medical records or autopsy report. *Id.* at 695–96. While the plaintiffs had insisted a differential diagnosis was used, the expert report simply stated that "Dr. Ferzoco's opinions were founded on reliable methods, experience, and data." *Id.* at 696 (cleaned up). The Seventh Circuit noted that this statement was "far to general" to situate the opinion in the domain of a differential-diagnosis methodology. *Id.* Even if preserved, the differential diagnosis also failed because there was no scientifically valid attempt to rule in and out possible causes of the medical condition, as is required. *Id.*

Even more stark, in this case, Dr. Larkins has specifically rejected the use of a differential diagnosis or etiology in his deposition: "Did you perform any kind of differential diagnosis to compare the different possible causes of the deep vein thrombosis that Mrs. Hanafin had? A. No, because I don't think that they contributed to it." [121-8] at 69:15–20. In the absence of these tried and tested methods, he has thus failed to articulate a scientifically valid way that he ruled in and out possible causes of Mrs. Hanafin's deep vein thrombosis through another accepted framework. Like in *Robinson*, Dr. Larkins' report states that he based his opinions on his "review of the

materials and education, training and experience as a physician and neurosurgeon." [121-2]; *Robinson*, 913 F.3d at 696. However, this statement fails to situate the report in any well-founded or scientifically valid methodology. *See e.g.*, *Robinson*, 913 F.3d at 696. Also, contrary to Plaintiff's assertions, and like *Robinson*, there is no evidence in the report of what possible causes of the deep vein thrombosis Dr. Larkins ruled in and ruled out. *Id.* Instead, Dr. Larkins broadly stated that his conclusion is a "well-known," "straightforward" concept. His conclusion – that spinal surgery was the cause –without more fails to articulate a reliable methodology as required under Rule 702 and *Daubert*. This lack of a reliable methodology necessitates exclusion of Dr. Larkins' testimony. Defendant's motion [113] is granted.

### ii. David Pope (Metallurgist)

In addition to medical experts, Plaintiff retained an expert to offer conclusions about Mrs. Hanafin's vehicle. David Pope is a metallurgical engineer who has a PhD in materials science from California Institute of Technology and currently serves as a Professor Emeritus in the Department of Material Science and Engineering at the University of Pennsylvania. As part of his retention, he examined the right and left control arms from Mrs. Hanafin's vehicle, as well as photos and videos from inspections, design specifications, records, and testimony from other engineers. Based on his expertise and observations, Pope found there was no gross deformation, undue wear, cracks, or corrosion in the right front upper control arm. He also observed that the ball joint was pressed up, but that was not the result of degradation, corrosion, undue wear, or deformation. Defendant objects to some of Pope's opinion on two grounds: (1) failure to disclose under Federal Rule of Civil Procedure 26; and (2) reliability under Federal Rule of Evidence 702. Further, Defendant asks the Court to strike Pope's entire opinion as unnecessary.

Federal Rule of Civil Procedure 26 requires an expert to disclose their qualifications, prior testimony, compensation, and a complete statement of all opinions, including underlying facts, data, and exhibits in a written report. Fed. R. Civ. P. 26(a)(2). "The purpose of Rule 26(a)(2) is to provide notice to opposing counsel – before the deposition – as to what the expert witness will testify[.]" *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008). Failure to comply with Rule 26(a)(2)'s requirements results in a party not being allowed to use that information or witness at a motion, hearing, or trial "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Defendant argues that Pope should be precluded from offering two undisclosed opinions: (1) when in the crash sequence the ball joint pushed through the passenger-side upper control arm; and (2) why it did so.

Defendant is correct that the two conclusions are not in Pope's expert report [119-2]. Pope admitted as much during his deposition. [119-3] at 14:6–18:22. Plaintiff does not dispute this fact. However, Plaintiff argues that the undisclosed conclusions are harmless and do not warrant exclusion because they are not a surprise – two other experts testified to similar opinions. The Seventh Circuit has indicated that the following factors should guide a district court's review of whether a failure to comply with Rule 26(a)(2) was substantially justified or harmless: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

In this case, Pope provided his opinion – that the ball joint pushed through the upper control arm shortly before Mrs. Hanafin's vehicle left the road because the part was defective – during his deposition. While there is no evidence of bad faith, it is clear from the deposition transcript that

13

Defendant was surprised about Pope's testimony. *See* [119-3] at 18:23–19:4. The lack of disclosure meant that defense counsel was unable to thoroughly prepare and cross-examine Pope at his deposition on these opinions. This prejudiced Defendant and hampered the purpose of the Rule 26 expert disclosures, which is to shorten or decrease the need for expert depositions. *Ciomber*, 527 F.3d at 642; *see also*, *Sherrod v. Lingle*, 223 F.3d 605, 613 (7th Cir. 2000) (Rule 26 disclosures are "intended to give opposing parties reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses.") (cleaned up).

Plaintiff challenges the prejudice argument on the basis that other experts offered similar testimony. This argument is unpersuasive under Seventh Circuit precedent. For example, in *Ciomber,* a district court excluded an expert after they submitted a vague report, but offered further explanation during their deposition. 527 F.3d at 642. The Seventh Circuit affirmed, holding that Rule 26(a)(2) does not allow the parties to cure deficient expert reports by supplementing them with later deposition testimony. *Id.* Since the purpose of Rule 26(a)(2) is to shorten or decrease the need for expert depositions, to allow parties the ability to cure a deficient report with later deposition testimony would undermine that goal. *Id.* Moreover, a Rule 26(a)(2) violation is not harmless "simply because the opposing party knew the witness would testify in some capacity." *Karum Holdings LLC v. Lowe's Companies, Inc.*, 895 F.3d 944, 952 (7th Cir. 2018) (disclosed fact witness testifying at trial as an expert is prejudicial and should be excluded). The same reasoning applies to this case. Discovery is also closed, and Plaintiff has already offered other experts with similar testimony. There is no need for Pope's duplicative, undisclosed opinions. Weighing the factors, the Court finds the lack of disclosure was not substantially justified or harmless.

Even if the Court were to hold otherwise, Pope's two undisclosed opinions must still be excluded for a failure to employ a reliable methodology. Pope's report offers observations about

Mrs. Hanafin's vehicle based on his review of records, inspection photos and videos, and design drawings. But Pope has not offered any methodology regarding how his observations led to the conclusion that the ball joint pushed through the upper control arm shortly before Mrs. Hanafin's vehicle left the road because the part was defective. *See In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, 2017 WL 1196990, at *27 (N.D. Ill. Mar. 31, 2017) (excluding Pope's opinion regarding a design defect because he failed to employ a "discernable methodology for distinguishing a product that fails because of a design defect rather than consumer misuse or any other reason."). He did not perform any testing in support of his opinion. [119-3] at 20:6–8. He also did not inspect the crash scene (*id.* at 85:18–20), review the crash download (*id.* at 77:15–18), perform a crash reconstruction analysis (*id* at 104:4–8), and/or talk to or review the accident reconstruction report (*id.* at 168:13–19, 77:22–78:1). Pope has not exhibited that he utilized a reliable method to come to the two undisclosed conclusions. For this additional reason, he is also barred from testifying to the undisclosed opinions.

Finally, Defendant asks the Court to strike the entirety of Pope's opinion because it does not rely on specialized knowledge, skill, experience, training, or education. The role of an expert is to assist a jury in understanding complex evidence that it cannot understand on its own. *Show v. Ford Motor Co.*, 659 F.3d 584, 586 (7th Cir. 2011). As outlined above, Pope's report offers observations about Mrs. Hanafin's vehicle and its parts. Pope's expertise and experience as a metallurgist qualifies him to opine on whether there is a deformation, undue wear, cracks, or corrosion on the vehicle part. This will assist a juror in understanding the photos of the ball joint, including where it was and what its condition was after the crash. These are technical issues that a lay person would have difficulty resolving without an expert because whether metal is deformed or worn is beyond the knowledge of an average juror. *Id.* at 586–88 (finding a product liability

case about a design defect in a vehicle required expert assistance). Thus, the Court will not exclude Pope's visual observations about Mrs. Hanafin's vehicle. Accordingly, Defendant's motion to exclude Pope [114] is granted in part and denied in part.

### iii.     Christopher Ferrone (Design Expert)

Plaintiff next engaged Christopher Ferrone as a design expert to review the mechanical condition, function, safety, and design of Mrs. Hanafin's vehicle, a 2018 GMC Sierra 1500. Ferrone has a degree in engineering mechanics, which is the study of forces and the resulting deformations, accelerations, motions, vibrations and other resulting actions, from the University of Wisconsin. He is certified by the National Institute for Automotive Service Excellence as a technician for trucks, automotives, and buses. Ferrone has been employed as a consulting mechanical expert witness with ARCCA, Inc. since 2006. This position has included work on vehicle accident reconstructions, equipment failures, as well as design and component functionality. In this case, Ferrone was engaged to analyze the suspension, control arms, and ball joints of the vehicle. He opined that a ball joint separation caused Mrs. Hanafin to lose control of her vehicle and crash. According to Ferrone, the ball joint separation was due to a design defect in Defendant's vehicle that could have been addressed.

Defendant argues that Ferrone's entire report should be excluded because: (1) he is not qualified to testify about human factors; (2) his causation opinions are not reliable; and (3) his design opinions are untested, unreliable, and legally irrelevant.

The Court starts with the causation reliability issue, as it is determinative of the human factors issue. Defendant contends that Ferrone's opinions that the ball joint pressed out before Mrs. Hanafin's vehicle launched off the culvert and caused her to drive off the road are unreliable. Courts have leeway in considering not only whether expert testimony is reliable, but whether the

16

expert reliably applied the methodology with soundness and care in coming to their assessments. *See Anderson v. Raymond Corp.*, 61 F.4th 505, 509–10 (7th Cir. 2023). As articulated above, some factors courts look at are whether a scientific theory has been tested, is subjected to peer review and publication, has a known error rate, or has general acceptance in the relevant scientific or expert community. *Id.* (*citing Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 505 (7th Cir. 2003)).

The Seventh Circuit previously affirmed the exclusion of Ferrone's testimony in *Burns v. Sherwin-Williams Co.*, 78 F.4th 364, 372–73 (7th Cir. 2023). In *Burns*, Ferrone offered the opinion that a "walkie" (hand-operated electric forklift) was unsafe and unsuitable because it failed to stop fast enough. *Id.* This opinion was based on tests where an individual drove an unloaded walkie and estimated the time and distance it took to stop. *Id.* at 373. Ferrone did not take any measurements. *Id.* And, there were no industry standards indicating how fast a walkie should stop. *Id.* at 373–74. As Ferrone's opinion could not be tested, had no error rate for the tests performed, was not subject to peer review, and was not shown to be generally accepted in the industry, the appellate court found it to be a bare conclusion that was properly excluded. *Id.* at 374. Ferrone also opined that the defendant had failed to maintain and inspect the equipment. *Id.* Again, he provided no support or foundation for these opinions, reciting facts without any analysis. *Id.* Thus, the appellate court affirmed that this testimony was inadmissible as well. *Id.*

*Timm v. Goodyear Dunlop Tires North America* is also instructive. In that case, the appellate court reviewed the district court's exclusion of an expert and found no error. 932 F.3d at 993–94. There, an expert posited that a motorcycle accident was the result of the tire unseating from the rim. *Id.* at 994. To arrive at this conclusion, the expert conducted a physical examination of the tire and wheel. *Id.* The district court excluded his opinions for failure to show that his conclusions "were the fruit of a rigorous, objectively-verified approach[.]" *Id.* In affirming the

district court's holding, the appellate court noted that the expert did not perform any controlled experiments, nor use empirical data. *Id.* There were also no relevant tests that could validate his opinion. *Id.*

Here, Ferrone opined that a ball joint separation caused Mrs. Hanafin to lose control of her vehicle and crash. As in *Timm*, Ferrone has failed to show his conclusions are the fruits of a rigorous, objectively verified approach. He did not test drive any vehicle or conduct any simulation or controlled experiments. [120-4] at 40:5–16. Ferrone also did not conduct a complete reconstruction – instead, he looked at the vehicle data and reviewed the first-person accounts. *Id.* at 162:13–163:8. The report does not articulate how Ferrone concluded that the ball joint separation occurred prior to the incident and caused Mrs. Hanafin to lose control. When asked about his methodology for eliminating other causes, Ferrone testified that he only looked at different factors in a "grocery list of things to look for in a suspension failure[.]" *Id.* at 202:21–203:10. As in *Burns*, Ferrone's opinion here is untested, was not subject to peer review, and was not shown to be generally accepted in the industry. 78 F.4th at 374. Ferrone has once again provided no support or foundation for his causation opinion, relying on conjecture from personal experience. *See e.g.*, *Burns v. Sherwin-Williams Co.*, 2022 WL 4329417, at **15–26 (N.D. Ill. Sept. 18, 2022), *affirmed by Burns v. Sherwin-Williams Co.*, 78 F.4th 364 (7th Cir. 2023); *Couture v. Haworth, Inc.*, 2020 WL 70931, at *7 (N.D. Ill. Jan. 7, 2020) (noting that Ferrone did not perform any tests and relied on conjecture from personal experience).

Plaintiff asserts that Ferrone's causation opinions are reliable because Mrs. Hanafin reported a noise, prior to the incident, that matches reports from other drivers who suffered a ball joint malfunction. Ferrone does not explain how he reached the conclusion that the sound matched other incidents. Nor has he articulated a method by which he analyzed how incidents were

substantially similar to this case. [120-4] at 32:15–34:18.  Conclusions without a reliable, testable methodology are insufficient. *Brown*, 765 F.3d at 776.  Because Ferrone did not state a reliable methodology through which a causation opinion about the ball joint could be offered, the Court need not analyze whether Ferrone has sufficiently qualified himself to render an opinion on the human factors at play in the causation opinion.

Next, Defendant takes issue with Ferrone's design defect opinions because they are untested, unreliable, and legally irrelevant. The Court addresses only the reliability contention as it is determinative.  "A strict liability claim is premised on a defect that renders a product dangerous because the product fails to perform in the manner one reasonably expects it to in light of its nature and intended function." *Bensenberg v. FCA USA LLC*, 31 F.4th 529, 535 (7th Cir. 2022).  Ferrone opines that the design of the control arm is defective because it lacks a "redundancy" (a snap ring or cap that covers the ball joint).  Here again, *Burns* and *Timm* are instructive, as Ferrone has failed to show his design defect opinions are based on any scientific, objectively-verified approach.  The design defect opinion is untested, was not subject to peer review, and was not shown to be generally accepted in the industry.  Ferrone baselessly states that, for a press fit design to be safe, it needs to have some sort of redundancy, including a cap, cover, or clip. [120-4] at 216:22–217:23.  But how does he know that?  Is there something in an industry standard that says that?  Is there a tested, published error rate between ball joints with and without snap rings?  Did he test anything and come to an error rate?  He doesn't say.  The only explanation given is that defendant GM has used it in other cars in the past, and that it is used in other machinery in the industry.  But that does not necessarily mean the current design is defective.  It doesn't even mean that the current design is subject to being pushed forward more than without the snap ring.  In other words, Ferrone failed to show that he did not look at any safety benchmarks for ball joints and control arms, review

literature or industry standards, or test alternative ball joint designs to determine which design is safest and whether the current design is defective. *Id.* at 217:24–218:4; 225:12–238:14. Defendant's motion to exclude Ferrone [112] is granted.

### iv. Andrew Thomas (Accident Reconstructionist)

Last but not least, Plaintiff retained Andrew Thomas to reconstruct Mrs. Hanafin's single-vehicle crash. Thomas is an accredited traffic crash reconstructionist that specializes in the investigation and reconstruction of motor vehicle crashes. He has more than 1,100 hours of training and serves as an adjunct professor at Northwestern University Center for Public Safety, where he teaches fundamentals of crash investigations, vehicle dynamics, crash reconstruction, and crash data retrieval. He also owns his own company, Collision Analytics LLC, which provides expert consulting in this area.

Defendant argues that Thomas' opinion should be excluded since his report is: (1) unreliable; (2) unhelpful to the jury; and (3) speculative. Defendant also argues that Thomas should be excluded from stating two conclusions because he is unqualified to opine on human factors.

Defendant's initial argument is that Thomas' reconstruction is unreliable and unhelpful to the jury because he failed to apply a methodology in a reliable fashion. Courts have leeway when considering not only whether expert testimony is reliable, but whether the expert properly applied a methodology in coming to their assessments. *See Anderson*, 61 F.4th at 509–10. In assessing a methodology, an expert must show the conclusions were based on a rigorous, objectively verified approach, considering numerous flexible factors. *See id.*; *Timm*, 932 F.3d at 994; *Gopalratnam*, 877 F.3d at 779–80.

Defendants assert that Thomas "cherry-picked facts" and provided nothing but speculation. However, Thomas' expert report states a rigorous methodology – more rigorous than other accident reconstruction experts that have been permitted to testify in this district. *See e.g.*, *Arrington v. City of Chicago*, 2022 WL 2105871, at \*7 (N.D. Ill. June 10, 2022) (accepting accident reconstruction methodologies based on data collected from the car, the police reports, photographs and maps of the site); *Paine ex rel Eilman v. Johnson*, 2010 WL 749857, at \*2 (N.D. Ill. Feb. 25, 2010) (finding expert's accident reconstruction was appropriately founded on traffic collision reports, photographs of the vehicle and accident site, and other mechanical and structural information); *Pike v. Premier Transp. & Warehousing, Inc.*, 2016 WL 6599940, at \*5 (N.D. Ill. Nov. 8, 2016) (holding an accident reconstruction expert's methodology was sound when he reviewed an accident report, photographs of the vehicle, aerial and street level images of the accident scene, medical records, deposition transcripts, and peer-reviewed publications).

Here, even more than in *Arrington*, *Paine*, and *Pike*, Thomas' report details his methodology, including that he surveyed the collision site in-person and via video. Thomas used measurements and aerial photography to develop orthomosaic imaging of the roadway. Orthomosaic imaging consists of overlapping, geo-referenced aerial images that have been corrected to ensure they are free from distortion. Thomas also employed a heatmap to determine elevations. Then he implemented software to map and model the accident. This process utilized data from the car (recovered from the event data recorder) and observations of the crash site. Thomas' methodology is sound. To the extent there are questions regarding factual matters underpinning Thomas' report, they can be challenged through cross-examination. *See Smith*, 215 F.3d at 718 ("The soundness of the factual underpinnings of the expert's analysis and the

correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact[.]").

Defendant spends most of its time contending that Thomas should be excluded from opining specifically on human factors. Human factors is a broad "discipline that incorporates a study of human behaviors, limitations, and capabilities into the design of products, systems and equipment." *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741 (7th Cir. 2007). A survey of case law in this circuit finds that experts employed to recreate accidents are sometimes qualified to offer testimony regarding human factors. *See Stapleton v. Union Pac. R.R. Co*., 2020 WL 2796707, at **3–10 (N.D. Ill. May 29, 2020) (accident reconstruction and biomechanical expert who had written on human factor considerations was qualified to testify); *Gardner v. Tristar Sporting Arms, Ltd*., 2010 WL 3238328, at *1 (S.D. Ind. Aug. 12, 2010) (expert was not sufficiently qualified to provide human factors opinions or accident reconstruction); *see Halvorsen v. Lettuce Entertain You Enters.*, 2003 WL 22859199, at *4 (N.D. Ill. Dec. 3, 2003) (reserving ruling on human factors elements of an expert's fall testimony until it could be determined if the proper foundation could be laid). Thomas' report has two conclusions which are based on human factors: (1) in response to the acute onset of the right front suspension abnormality, Mrs. Hanafin counter steered to the left; and (2) the minimal left-steering response necessary to initiate the GMC's departure from the roadway was a reasonable and appropriate response by Mrs. Hanafin due to the onset of the suspension abnormality. Thomas has not clearly exhibited his qualifications or a methodology for these opinions.

First, Thomas admits in his deposition that he is not an expert in human factors. *See* [118-3] at 96:9–11. He does not have a degree or certificate in psychology or a field relating to human factors. *Id.* at 96:12–16; 97:10–12. However, he has had over a hundred hours of training regarding

"human factor applications to crash reconstruction." *Id.* at 96:17–97:1. But it is unclear exactly what "human factor applications to crash reconstruction" means. For example, has Thomas studied how humans react when faced with an unexpected noise? How common is it to speed? What makes humans veer? How humans react to a steering malfunction? Without more details regarding Thomas' training and expertise in this area, the Court cannot find him qualified.

More troubling, Thomas has articulated no methodology for how he came to his two conclusions about Mrs. Hanafin's responses. As detailed at length above, courts evaluate flexible factors when determining whether a reliable methodology was applied with soundness and care. *See Anderson*, 61 F.4th at 509–10. In *Abrams v. FedEx Ground Package System, Inc.*, the district court found a paramedic expert could not testify about how the individuals psychologically felt during a vehicle accident despite relying on a psychology article. 585 F. Supp. 3d 1131, 1149–50 (S.D. Ill. Feb. 14, 2022). The district court found the opinions were based on the expert's personal experience and not on any sound reliable basis as he was not a psychologist. *Id.* The same is true of Thomas' opinions about Mrs. Hanafin's reactions in this case. Thomas states that Mrs. Hanafin was first exposed to an abnormality in her vehicle while driving. [118-2]. Then, Thomas hypothesizes how Mrs. Hanafin responded. As in *Abrams*, Thomas cannot "speak to a psychological theory," especially an unquantified one. 585 F. Supp. 3d at 1150. Further underscoring the need for exclusion, Thomas has failed to provide a basis for his opinion, let alone one that has been "tested, peer reviewed, analyzed for known error rates, or [] is generally accepted in the psychology community." *Id.* at 1150. While Thomas may opine on what the car did throughout the accident sequence he reconstructed, he cannot opine on Mrs. Hanafin's hypothesized responses.

Finally, Defendant asserts that Thomas' testimony will not aid the jury because he speculates.  Specifically, Defendant takes issue with the fact that Thomas testifies about: (1) which direction Mrs. Hanafin initially steered; (2) whether the car's or Mrs. Hanafin's response was sluggish; and (3) why Mrs. Hanafin accelerated into oncoming traffic.  Only the first point is included in Thomas' report as an opinion, and it has been excluded above.  The other two opinions have not been disclosed pursuant to Rule 26(a)(2).  Even so, they too fall into the category of speculation on Mrs. Hanafin's response.  Thomas is unqualified and has failed to state a reliable methodology for offering opinions on that topic.  He may only offer opinions about how the car functioned during the accident based on his extensive reconstruction, but not on how Ms. Hanafin reacted.

Accordingly, Defendant's motion relating to Thomas [111] is granted in part and denied in part.

## Conclusion

For these reasons, the motions to exclude [111] [112] [113] [114] [115] are granted in part and denied in part to the extent outlined above.

**SO ORDERED.**

Dated:  August 15, 2025

_____
Sunil R. Harjani
United States District Judge